**NOT YET SCHEDULED FOR ORAL ARGUMENT**
_____

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

**No. 12-7115**
**(C.A. No. 07-570)**

**EMMETTE McCORMICK, JR.,**

**PLAINTIFF-APPELLANT,**

**v.**

**DISTRICT OF COLUMBIA, <u>et al.</u>,**

**DEFENDANT-APPELLEE.**
_____

**BRIEF FOR APPELLANT**
_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
_____

**ROBERT C. SELDON, ESQ.**
**LAUREN E. MARSH, ESQ.**
**ROBERT C. SELDON & ASSOC., P.C.**
**1319 F STREET, NW, SUITE 200**
**WASHINGTON, D.C. 20004**
**(202) 393-8200**
**COUNSEL FOR APPELLANT**

**April 8, 2013**

## APPELLANT'S CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A)   Parties:**     The plaintiff/appellant in this action is Emmette McCormick, Jr.   The defendant/appellees are the District of Columbia; Devon Brown, Director of the Department of Corrections, in his individual capacity, and Wanda Patten, Chief, Office of Internal Affairs, Department of Corrections, in her individual capacity.

**(B)   Ruling Under Review**:   The ruling under review is the District Court's Memorandum Opinion and Judgment of October 22, 2012, issued by the Hon. James S. Gwin.   The District Court's decision has been reported in McCormick v. District of Columbia, 2012 U.S. Dist. LEXIS 151512 (D.D.C.).

**(C)   Related Cases**:   There are no related cases.


Respectfully submitted,

Robert C. Seldon, Esq.
Lauren E. Marsh, Esq.
Robert C. Seldon & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C.  20004
(202) 393-8200
Counsel for Appellant


By:    /s/ Lauren E. Marsh
       Lauren E. Marsh, Esq.

## <u>TABLE OF CONTENTS</u>

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION ...................................................................1

ISSUES PRESENTED FOR REVIEW………………………………… 1

STATEMENT OF THE CASE ....................................................................2

STATEMENT OF FACTS .........................................................................7

    Background .........................................................................................7

    Mr. McCormick's Career Status .......................................................8

    Mr. McCormick's Chosen Professional Field .................................8

    Mr. McCormick's Protected Disclosure About the
        Office of Internal Affairs.........................................................10

    IA's First Attempt to Terminate Mr. McCormick…………………….. 11

    The Alleged Tobias Incident.............................................................13

    The IA Report Regarding the Alleged Tobias Incident ....................14

    The IA Report Excluded or Discounted Statements
    That Exonerated Mr. McCormick.....................................................16

    Two Officers Changed Their Contemporaneous Accounts Only
    After Being Placed Under Investigation ...........................................18

    Lieutenant McCormick's Interview ..................................................20

    The Unreliable Medical Evidence.....................................................21

    The Decision to Terminate McCormick ...........................................22

    The Impact of Mr. McCormick's For-Cause Termination on His Career..........24

    Lack of Due Process..........................................................................25

    SUMMARY OF THE ARGUMENT ..................................................26

i

STANDARD OF REVIEW ....................................................................29

ARGUMENT ......................................................................................30

    I.  The District Court Erred In Finding that Mr. McCormick
       Was Terminated   For A "Legitimate" Reason Unrelated To
       His Protected Whistleblower Activity. ........................................30

        a.  Mr. McCormick Faced Prohibited Personnel
            Practices After Making Protected Disclosures. ....................32

        b.  Mr. McCormick's Protected Disclosures Were
            A "Contributing Factor" To His Termination. .....................34

        c.  Defendant Failed To Demonstrate That
            Mr. McCormick Was Terminated For An
            "Unrelated, Legitimate Reason." ..........................................36

    II.  The District Court Erred In Finding That Plaintiff's Fifth
       Amendment Due Process Liberty Interests Were Not
       Violated When He Was Terminated For Cause On False
       Grounds Of Misconduct. ............................................................37

        a.  The 1998 Amendment To The DC Comprehensive
            Merit Personnel Act That Created The At-Will
            Management Supervisory Service Did Not Provide
            Mr. McCormick Any Appeal Rights. ....................................41

        b.  Defendant Failed To Provide Mr. McCormick
            The Record Underlying  Its Supposed Grounds
            For Termination And Failed To Afford Him An
            Opportunity To Be Heard. .....................................................44

    III.  The District Court erred in finding that Defendants
        Brown and Patten were entitled to qualified immunity. .............46

CONCLUSION ...................................................................................48

# TABLE OF AUTHORITIES

## Cases

Adickes v. S.H. Kress Co.,
 398 U.S. 144 (1970)……………………………………………………… 29

Alexis v. District of Columbia,
 44 F. Supp. 2d 331(D.D.C. 1999)…………………………………..…...… 43

Amato v. Bernard,
 618 F.2d 559 (9th Cir. 1980)……………………………………..……... 44

Anderson v. Liberty Lobby, Inc.,
 477 U.S. 242 (1986)……………………………………………………… 29

Bivens v. Six Unknown Named Agents,
 402 U.S. 388 (1971)……………………………..………………………... 46

Bridges v. Kelly,
 84 F.3d 470 (D.C. Cir. 1996)……………………………………………... 40

*Board of Regents v. Roth,
 408 U.S. 564 (1972) ……………………………………...……… 28, 38, 43

Brady v. Office of Sgt. at Arms,
 520 F.3d 490 (D.C. Cir. 2008)……………………………………………... 30

Celotex Corp. v. Catrett,
 477 U.S. 317 (1986)……………………………………………………… 29

Clayton v. District of Columbia,
 2013 U.S. Dist. LEXIS 39270…………………………………..……... 28, 42, 43

*Cleveland Bd. of Ed. v. Loudermill,
 470 U.S. 532 (1985)………………………………………………….… 39, 41, 47

*Authorities upon which we chiefly rely are marked with asterisks.

Crockett v. D.C. Metro Police Dep't,
    293 F. Supp. 2d 63 (D.D.C. 2003)…………………………………………… 40

Doe v. U.S. Department of Justice,
    753 F.2d 1092 (D.C. Cir. 1985)…………………………………………….... 41

Garrity v. New Jersey,
    385 U.S. 493 (1967)………………………………………...…………… 21, 34

Fogg v. Gonzales,
    492 F.3d 447 (D.C. Cir. 2007)…………………………………………….. 37

*Harlow v. Fitzgerald,
    457 U.S. 800, 818 (1982)…………………………..…………………… 29, 46

Holman v. Williams,
    436 F. Supp. 2d 68 (D.D.C. 2006)…………………………………….. 43, 44

Hoey v. District of Columbia,
    540 F. Supp. 2d 218 (D.D.C. 2008)…………………………………….. 43

Ifill v. District of Columbia,
    665 A.2d 185, 189 (D.C. 1995)…………………………………………… 40

Kartseva v. Dep't of State,
    37 F.3d 1524 (D.C. Cir. 1994)…………………………………………….. 38

Lathram v. Snow,
    336 F.3d 1085 (D.C. Cir. 2003)…….……………………………... 29, 35, 36

Library of Congress v. Shaw,
    478 U.S. 310 (1986)…………………………………………………… 41

Mastro v. Potomac Electric Power Co.,
    447 F.3d 843 (D.C. Cir. 2006)…………………………………………… 35

*Mathews v. Eldridge,
    424 U.S. 319 (1976)……………………………………………28, 39, 47

iv

Mosrie v. Barry,
   714 F.2d 1151 (D.C. Cir. 1983)……………………………………………47

*O'Donnell v. Barry,
   148 F.3d 1126 (D.C. Cir. 1998)…………………………………….. 29, 38, 43, 47

Owen v. Independence,
   445 U.S. 622 (1980)……………………………………………………... 40, 41

Reeves v. Sanderson Plumbing Prods,
   530 U.S. 133 (2000)…………………………………………………….... 29

Singletary v. District of Columbia,
   685 F. Supp. 2d 81 (D.D.C. 2010)……………………………………… 40

Smith v. Robinson,
   468 U.S. 992 (1984)……………………………………………………… 44

*Staub v. Proctor Hospital,
   131 S. Ct. 1186 (2011)…………………………………….……….…... 32, 37

Tao v. Freeh,
   27 F.3d 635 (D.C. Cir. 1994)………………………...……………………. 29

Valiant Steel v. Goldschmidt,
   499 F. Supp. 410 (D.D. C. 1980)…………………………………………... 44

Zirkle v. Dist. of Columbia,
   830 A.2d 1250 (D.C. 2003)…………………………………………….... 33

**Statutes and Regulations**

D.C. Code § 1-602.01……………………………………………… 8, 28, 41, 42

D.C. Code. § 1-608.01……...……………………………………… 8, 28, 41, 42

D.C. Code § 1-609.51……………………………………………… 3, 8, 22, 23, 42

D.C. Code § 1-609.54……………………………………….... 3, 8, 9, 23, 24, 28, 41, 42

D.C. Code § 1-615.52……………………………………….. 31, 32, 33, 34 35

D.C. Code § 1-615.53…………………………………...…… 30, 31

D.C. Code § 1-615.54………………………………………... 26, 31, 32, 37

D.C. Personnel Regulations § 3818.1……………. 3, 8, 9, 12, 15, 23, 34, 35, 42, 44

D.C. Personnel Regulations § 3818.6……………………………. 3, 8, 9, 23, 42, 44

# GLOSSARY OF ABBREVIATIONS

"DOC":      District of Columbia Department of Corrections

"IA":         Department of Corrections Office of Internal Affairs

"MSS":      Management Supervisory Service

"OEA":      Office of Employee Appeals

"DCDC 1":  Report of Significant Incident/Extraordinary Occurrences

"CMPA":    D.C. Comprehensive Merit Personnel Act

## STATEMENT OF SUBJECT MATTER AND
## <u>APPELLATE JURISDICTION</u>

This action was originally filed in the Superior Court of the District of Columbia.    Jurisdiction of the Superior Court was based upon the D.C. Whistleblower Statute, D.C. Code §§ 1-615.51, <u>et</u> <u>seq.</u>; the Fifth Amendment to the Constitution; 42 U.S.C. § 1983; and D.C. Code § 13-432. On March 22, 2007, defendant removed this action to the U.S. District Court for the District of Columbia.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

This appeal lies from the Memorandum Opinion, as amended, and Judgment of October 22, 2012, issued by the Hon. James S. Gwin below.  A notice of appeal was timely filed on October 23, 2012.

## <u>ISSUES PRESENTED FOR REVIEW</u>

The following issues are presented on appeal, having been resolved against Plaintiff on defendant's Motion for Summary Judgment:

I.      Whether the District Court erred in finding that retaliation by the D.C. Department of Corrections ("DOC") for Plaintiff's protected whistleblower disclosures about its Internal Affairs division was not a contributing factor to Plaintiff's termination, and that his termination occurred for an unrelated, legitimate reason, when a false report prepared by Internal Affairs that accused Plaintiff of using excessive force toward an inmate provided the sole basis for his termination.

1

II.     Whether the District Court erred in finding that Plaintiff was not deprived of his Fifth Amendment liberty interests without due process when he was terminated for cause on false grounds of using excessive force against an inmate because Plaintiff did not exhaust administrative remedies under the D.C. Comprehensive Merit Personnel Act when:

> a.  Plaintiff had no remedies under the D.C. Comprehensive Merit Personnel Act, D.C. Code §§ 1- 601, et seq., because he occupied an at-will position that excluded him from that Act's appeal processes.  D.C. Code §§ 1-609.51, .54(a).
>
> b.  Defendants failed to provide Plaintiff the record underlying its supposed grounds for terminating him and failed to afford Plaintiff a pre-termination or post-termination hearing to contest that record and defendant's reasons for terminating him.

III.     Whether the District Court erred in finding that Defendants Brown and Patten were entitled to qualified immunity when they violated clearly established constitutional law by terminating Plaintiff for cause and foreclosing his career as a corrections officer without due process of law.

## STATEMENT OF THE CASE

Plaintiff Emmette McCormick, Jr., was, until the actions that gave rise to his complaint, a highly regarded supervisory corrections officer with the District of

2

Columbia Department of Corrections ("DOC").  J.A. 412-416.  In October of 2003,

after he had been in the D.C. Career Civil Service for 19 years, Mr. McCormick

was converted to the D.C. Management Supervisory Service ("MSS") and became

an at-will employee, a change in status that stripped him of any appeal rights over

termination from his employment.  J.A. at 67, 1012-1013; D.C. Personnel Manual

§§ 3818.1, .6 (J.A. 1007-08); D.C. Code §§ 1-609.51, .54(a).

On January 13, 2006, Mr. McCormick led a team of corrections officers to a

housing facility in the D.C. Central Detention facility, after a junior officer

negligently released approximately one hundred violent inmates at once, to return

these criminals to their cells.  J.A. 696.  The resistance of several inmates forced

Mr. McCormick to use a chemical spray.   J.A. 701-02.   This incident was

investigated promptly on scene and nothing out of the ordinary was reported.  J.A.

706-21.   Several days later, however, the girlfriend of first-degree murderer

Michael Tobias sent an email to a City Councilmember stating that Tobias had

been handcuffed, held down by six corrections officers, and beaten by Mr.

McCormick. J.A.  699-700.  The contents of this email were then referred to

DOC's Office of Internal Affairs ("IA") for investigation.  J.A. at 699.

Prior to this incident, Mr. McCormick had blown the whistle on IA,

disclosing that it released the names and addresses of two correctional officers that

were slated to testify at trial against a violent inmate.  J.A. 417, 425, 963-64, 969-

70.  One of the IA officers involved in releasing the names used the investigation

into the Tobias incident as an opportunity to prepare a false report which charged

Mr. McCormick with using excessive force.   J.A. 417, 615, 685-697.   In this

report, the investigator buried the statement of the disinterested witness most likely

to have seen the alleged incident and who had reported that Mr. McCormick did

not strike or do anything untoward to Mr. Tobias.   Compare J.A. 689-694 with J.A.

880-884.   She also attempted to have him prosecuted in violation of his Fifth

Amendment right against self-incrimination.  J.A. at 110.

 This false report was then served up to the Director of DOC, who terminated

Mr. McCormick for cause and effectively foreclosed him from future employment

as a corrections officer.   J.A. 685, 990.   Unable to secure new employment in this

field, Mr. McCormick now drives a delivery truck.   J.A. 420-21.

 Mr. McCormick initiated this action in the D.C. Superior Court on February

21, 2007 to contest defendants' deprivation of his liberty interests without due

process of law under the Fifth Amendment and 42 U.S.C. § 1983, and the

retaliatory actions defendants took against him in violation of the D.C.

Whistleblower Statute, §§ 1-615.51, et seq.[1]  Defendants removed this case to the

United States District Court for the District of Columbia on March 22, 2007 and

---

[1]      A separate claim alleging wrongful discharge in violation of public policy
was alleged but not pursued.

4

Mr. McCormick subsequently filed his First Amended Complaint on March 29, 2007.  J.A. 4.

Defendants filed a renewed motion to dismiss, or in the alternative, for summary judgment on August 10, 2010, which Mr. McCormick opposed in due course.[2]  J.A. 10, 14.  The district court granted summary judgment in favor of defendant on all counts on October 22, 2012.  J.A. 47-65.  Mr. McCormick timely filed a Notice of Appeal on October 23, 2012.  J.A. 16.  The following day, the district court sanctioned defendants for its discovery abuses.  J.A. 16.

The district court made two factual findings that were correct and are not subject to this appeal.  First, it found that Mr. McCormick raised a genuine issue of material fact as to whether his termination foreclosed his protected liberty interest in future employment as a corrections officer.[3]  J.A. 57.  It also assumed that Mr. McCormick's disclosure that IA had improperly released the names and addresses of two corrections officers to violent inmates and endangered their safety was a protected disclosure under the D.C. Whistleblower Statute.  J.A. 62.

---

[2]    Pursuant to the Order of the District Judge originally assigned to this case, after being filed under seal in the first instance, Plaintiff's Opposition was filed on the public record without redaction.  J.A. 14.

[3]    Counts III and IV of the First Amended Complaint raised claims under the Fifth Amendment and 42 U.S.C. § 1983, respectively, that defendant's actions also deprived Mr. McCormick of his occupational liberty interest by stigmatizing him without due process of law.  J.A. at.  35-40.  Mr. McCormick does not pursue these claims on appeal.

However, the district court incorrectly found that Mr. McCormick failed to demonstrate that he was deprived of his Fifth Amendment liberty interest without due process of law because he did not exhaust his administrative "remedies" under the D.C. Comprehensive Merit Personnel Act ("CMPA").[4]   In fact, Mr. McCormick had <u>no</u> administrative recourse as an at-will member of the D.C. Management Supervisory Service.  J.A. 58-60.  The district court also found that Mr. McCormick failed to demonstrate that his termination was in retaliation for his protected disclosures under the D.C. Whistleblower Statute because the false IA report accusing Mr. McCormick of using excessive force – which provided the very basis for Mr. McCormick's termination and was created in direct retaliation for his protected disclosures – was somehow an "unrelated, legitimate reason for his termination."   J.A. 63.   Finally, it held that qualified immunity protected defendants Devon Brown and Wanda Patten from individual liability despite the fact that they violated Mr. McCormick's clearly established constitutional rights. J.A. 60-61.

---

[4]      The district court did not address the issue of whether defendant violated Mr. McCormick's rights under 42 U.S.C. § 1983, as Mr. McCormick claimed in Count III of his Complaint, presumably because defendant did not raise this issue on Summary Judgment.

## STATEMENT OF FACTS

### Background

Emmette McCormick Jr., the appellant in this action, was a highly regarded Supervisory Correctional Officer for DOC until his unlawful termination in March of 2006.  J.A. 412-13.   In his more than twenty years of service with DOC, Mr. McCormick was recognized on numerous occasions for his outstanding performance.  J.A. 412-13.  In 1997, he was appointed Acting Major under the immediate supervision of the Warden of the Occoquan Facility, where he served in a supervisory capacity over approximately six hundred employees and was responsible for the safe and secure confinement of 1300 inmates.  J.A. 412-13.  He also served as a member of the Management Assistance Team, the group of expert consultants that was appointed by the former DOC Director and commissioned to improve the safety and security of the facility.  J.A. 413.  During his service, the Management Assistance Team substantially reduced inmate violence and implemented sound security procedures at the Occoquan Facility.  J.A. 413.  Mr. McCormick's remarkable performance at the Occoquan Facility earned him the title of "Acting Major with Distinction," and with it, a substantial cash bonus.  J.A. 413.

When the Occoquan Facility was closed in 1999, Mr. McCormick was reassigned as an Acting Major to the D.C. Jail/Central Detention Facility.  J.A.

413.  This facility is where prisoners awaiting trial and who have not been released on bail or on their own recognizance, or are convicted of crimes during their sentences, are incarcerated. J.A. 413.  In 2004, Mr. McCormick was appointed Acting Captain in Charge of the Special Management Unit, the senior official of the unit responsible for the maintenance and incarceration of inmates who have been convicted of committing exceptionally violent crimes, have engaged in violence while incarcerated, and have a history of escaping from prison.  J.A. 413. After a re-organization and through no fault of his own, Mr. McCormick's position at the time of his unlawful termination was Lieutenant Supervisory Correctional Officer.  J.A. 413.

### Mr. McCormick's Career Status

In 2003, by an amendment to the D.C. Code, Mr. McCormick was taken out of career service and put into Management Supervisory Service ("MSS"), rendering him an at-will employee subject to termination without any appeal rights.  J.A. at 66, 67; D.C. Code §§ 1-609.51, .54; D.C. Personnel Manual §§ 3818.1, .6 (J.A. 1007-08).  Until then, Mr. McCormick had been a member of the D.C. career civil service and entitled to appeal rights to the Office of Employee Appeals ("OEA").  D.C. Code §§ 1-602.01; 1-606.03; 1-608.01.  By statute, and according to defendant's internal HR publications and the letter terminating Mr. McCormick, he had no administrative remedies before the OEA or through <u>any</u>

8

other administrative appeals process now that he was in MSS.  D.C. Code § 1-609.54; D.C. Personnel Manual §§ 3818.1, .6 (J.A. 1007-08); J.A. 66.

### Mr. McCormick's Chosen Professional Field

Mr. McCormick's chosen professional field, which he joined in 1984, is as a Supervisory Corrections Officer. J.A. 413-14.  His only other professional experience is with the United States Marine Corps, where he served on active duty during the 1991 Gulf War and retired as First Sergeant.  J.A. 413-14.  His duties as a Supervisory Corrections Officer included managing, supervising, and performing the full spectrum of correctional duties and inmate control.  J.A. 413-14.

The Corrections Officer field is highly specialized.  J.A. 413.  The "paramount requirement" of corrections officers is "the knowledge and application of correctional skills and technique." J.A. 132, 413.  This is because their jobs are especially dangerous and include handling "fights among inmates . . . riots . . . escape attempts," assaults on officers "with dangerous weapons," and officers being "held as hostages . . . with the possibility of being seriously injured or killed."  J.A. 132, 137.  These positions are also "highly individualized" and require a considerable amount of knowledge and experience "in a variety of diverse operational and treatment programs."  J.A. 413.  Other government law enforcement positions require similar specialized knowledge.  J.A. 143- 331, 414.

9

**Mr. McCormick's Protected Disclosure About the Office of Internal Affairs**

On March 4, 2005, John Corbett, the then-Acting Warden of the D.C. Jail/Central Detention Facility, directed Mr. McCormick to assemble his subordinates to search inmate cells when he learned that unredacted written statements given by two correctional officers slated to testify in the prosecution of a violent inmate – who was charged with "brutally assault[ing]" a third officer – had been improperly released during the criminal discovery process. J.A. 417, 468-70, 472, 951-68. These statements, which were taken by IA, contained the home addresses of those two officers and were transmitted without redaction to the inmate charged in the assault. J.A. at 103-04, 468-69, 472, 963-64. This release put these two officers in grave danger: another officer whose personal information had previously been disclosed to an inmate had recently been "gunned down" and killed the morning that he was scheduled to testify in court. J.A. at 467. These officers were fearful of their safety and the safety of their families, as was Mr. Corbett. J.A. 417, 467, 956-57.

During Mr. McCormick's search, an inmate turned over un-redacted copies of the two corrections officers' statements, which included their names and addresses. J.A. 963-68. After questioning this inmate further, Mr. McCormick prepared an official Informative Report of his search, identifying where and from whom the statements were recovered. J.A. 417, 963-64. The report included

10

copies of the statements, which clearly included the officers' personal information and identified that they had been taken by Wanda Patten from IA.  J.A. 417, 963-68.  The Informative Report was transmitted to acting Warden Corbett, the Deputy Director of DOC, and the Office of Internal Affairs.  J.A. 417, 425, 963-64, 966-70.  The potential repercussions of this leak were so grave that after this incident, DOC changed its policy so that Correctional Officers' home addresses are no longer <u>ever</u> permitted to be transmitted outside of DOC without the director's personal authorization.  J.A. 499.

## IA's First Attempt to Terminate Mr. McCormick

Within several weeks of disclosing his Informative Report, Mr. McCormick was directed to coordinate the conclusion of an investigation into the seizure of crack cocaine from an inmate's cell.  J.A. 417.  This investigation was to include the submission of an official report by a K-9 correctional officer.  J.A. 417.  Mr. McCormick, who did not arrive on the scene until after the drugs had already been seized, was certified to conduct drug-testing; he then examined the seized contraband and confirmed that it was crack cocaine and subsequently directed the corrections officer who recovered the narcotics to prepare a written report of the seizure.  J.A. 417-18.  The officer reported that he had seized the crack cocaine with the assistance of a drug-sniffing dog, but it turned out that the dog had only <u>verified</u> the location of the drugs before the officer had seized them and after Mr.

11

McCormick had arrived on the scene.  J.A. 418.  After another officer advised Mr. McCormick of this discrepancy, Mr. McCormick notified senior corrections management and directed the K-9 officer to file a corrected report.  J.A. 418.

Ms. Patten seized this discrepancy as an opportunity to retaliate against Mr. McCormick for his disclosure about IA.  Mr. McCormick did nothing incorrect or improper in either the original report or the corrected one, and in fact, was the one who brought the discrepancy to the attention of Acting Warden Corbett.  J.A. 418, 475, 484.  Acting Warden Corbett believed that this was nothing more than an innocent mistake or misunderstanding.  J.A. 475.  Even Ms. Patten later admitted that Mr. McCormick would have had no personal incentive to file a false report.  J.A. 621.

Nonetheless, on June 9, 2005, Ms. Patten produced an extensive report for IA charging Mr. McCormick with interfering with its investigation into the conflict between the original report and the subsequent corrected version.  J.A. 620.  On August 1, 2005, then-IA Chief Elwood York, while serving as Interim Director of DOC, transmitted the IA report to Deputy Mayor Edward Reiskin recommending Mr. McCormick's termination as required by D.C. Personnel Manual § 3818.1.  J.A. 100, 1007.  The Deputy Mayor disapproved the recommendation.  J.A. 100.

12

## The Alleged Tobias Incident

After IA failed in its first attempt to have Mr. McCormick terminated, only several months passed before another opportunity presented itself. On January 13, 2006, shortly before 3:00 p.m., Corrections Officer Jimmy Harper released approximately one hundred violent prisoners from their cells at once in a housing unit in the Central Detention Facility. J.A. 686. Mr. McCormick was called to head a team to return the prisoners back to their cells. J.A. 687. Chaos ensued and several inmates resisted these officers' attempts. One inmate, Leroy Hinton, "began to charge at Lieutenant McCormick refusing to be placed in his cell," resulting in his exposure to "a burst of chemical agent . . . to avoid any further aggression." J.A. 702. Another inmate, Albert Booth, "elbowed Lieutenant McCormick in the chest area and used profane language," again resulting in Mr. McCormick's releasing of a burst of chemical agent in his "direction." J.A. 701. A third, convicted murderer Michael Tobias, had to be restrained after throwing "a watery liquid substance" at Mr. McCormick. J.A. 701-02.

Each of the officers who were on duty during the prisoners' release were required to complete a Report of Significant Incident/Extraordinary Occurrences ("DCDC 1") before the end of the day. J.A. 418, 465, 548. These reports were to include any event that was out of the ordinary at the Central Detention Facility, including the use of force by a corrections officer upon an inmate, a physical

13

assault by a corrections officer upon an inmate, and any injuries to an officer or inmate.  J.A. 465, J.A. 710-12.  <u>None</u> of these reports indicated that Mr. McCormick had done anything untoward to Tobias or mistreated him or any other inmate in any way.  J.A. 418, 708-716.

There this matter would have ended but for an email sent five days later to a City Councilmember from someone purporting to be Tobias' sister, but who in reality was his girlfriend. J.A. 699-70.  This email baselessly charged that after "ice was thrown" at Mr. McCormick "from the area" that her "brother" had "walk[ed] passed," Mr. McCormick handcuffed Tobias, escorted him to an enclosed walkway/holding area known as the "sally port," and punched him in the face and ear while six other guards held him down.  J.A. 699.  Despite the fact that these accusations were in no way corroborated by the official on-site report, this email was forwarded to DOC and passed on to Internal Affairs to investigate.  J.A. 699.

### <u>The IA Report Regarding the Alleged Tobias Incident</u>

This email gave Ms. Patten, who had been the subject of Mr. McCormick's earlier protected disclosure, another chance to attempt to have him terminated in retaliation.  J.A. 705.  She was the Chief of Internal Affairs when IA received the email about Mr. McCormick's supposed use of excessive force against Tobias. J.A. 594.  She served as one of the investigators into the Tobias incident and was the reviewing officer before the final IA report was issued; it was her written and

14

oral reports that defendant relied upon as its basis for terminating Mr. McCormick. J.A. 502-03, 686, 881.  Although Mr. McCormick's career hinged on it, there were no policies, practices, or guidelines in IA for conducting an investigation of this nature.  J.A. 596.

The IA report concluded that Mr. McCormick used excessive force and assaulted Tobias by allegedly slapping him across the face after bringing him to the sally port.  J.A. 696-97.  Director Brown, relying <u>solely</u> on the IA report, then terminated Mr. McCormick for cause "based on an Internal Affairs investigative finding" that he had engaged in "wrongdoing . . . of a serious nature."  J.A. 502-03, 990.   He did so despite the fact that the only official who could have made a decision on Mr. McCormick's termination was the Deputy Mayor.  D.C. Personnel Manual § 3818.1 (J.A. 1007).

Director Brown, who did not review the witness interviews or medical reports in reaching his decision to terminate Mr. McCormick, expected that the report would present evidence on both sides of the alleged incident, not just the evidence that went against Mr. McCormick.  J.A. 495, 505-06.   That is not what the report did.  The final report not only hid the statement of the one corrections officer who could and did unequivocally exculpate Mr. McCormick of any wrongdoing, it did not include statements from two likely eyewitnesses and was based in great part on the shifting accounts of two officers who only claimed to

15

have seen Mr. McCormick slap Tobias after they themselves were put under investigation.   J.A. 685-97, 716-18, 719, 787, 818-21, 827, 880-884, 947.   In addition, it relied on a medical report that in no way corroborated Tobias' account of the alleged assault and in fact discredited it.  J.A. 112-116, 688.   After all was said and done, Ms. Patten even admitted that none of Tobias' main allegations were ever corroborated.  J.A. 606-07.

**The IA Report Excluded or Discounted Statements<br>That Exonerated Mr. McCormick**

Many key facts surrounding the alleged Tobias incident and investigation conspicuously went unmentioned in the IA report that was used as the basis to terminate Mr. McCormick.  J.A. 685-97.  Perhaps most important of all was the statement of Corrections Officer Terry Brown – who was the only corrections officer in a position to witness the alleged incident who did not have any stake in the outcome of the IA investigation – which exonerated Mr. McCormick. Compare J.A. 689-94 with J.A. 880-84.  On the day of the incident, Corporal Brown filed a DCDC 1 that made no mention of any "assault" by Mr. McCormick. 719-21.  It did confirm that Tobias would not respond to the officer's commands to go into his cell until chemical spray was discharged.  J.A. 719.

When IA interviewed Corporal Brown during its investigation, Ms. Patten attempted to discredit his account of events by suggesting that he could not see into the sally port during the alleged incident.   J.A. 880-84.   This attempt failed.

16

Officer Brown stated that he could "see the inmates in the Sally port" the whole time Mr. McCormick and Tobias were in there and saw "[n]othing out of the ordinary." J.A. 719, 884. He later confirmed in his deposition that he could see into the sally port when Mr. McCormick and Tobias were in there and that he did not see Mr. McCormick hit Tobias, did not hear Tobias say that Mr. McCormick hit him or that his ear hurt, and did not see Mr. McCormick use <u>any</u> force on Tobias. J.A. 556-58. He testified that he "definitely" knows what he saw and that, if he had witnessed Mr. McCormick using any force at all, he would have reported it. J.A. 557.

The IA report did not state that Officer Brown was able to see into the sally report and did not see Mr. McCormick strike Tobias or see anything else "out of the ordinary." J.A. 884. Instead, Ms. Patten lumped him in as one of the nine officers who could not have observed the incident and for that reason "were interviewed and claimed to have no knowledge of Lieutenant McCormick hitting Inmate Michael Tobias." J.A. 694. Even though Ms. Patten was present for Officer Brown's interview statement, she did not bring his statement to the attention of Director Devon Brown. J.A. 505, 507-08, 881. He never saw it or was able to consider it, and thus took the IA report's single sentence about Officer Brown to mean that he was "not in a position" to see into the sally port – <u>not</u> that he could see in and that what he saw exculpated Mr. McCormick. J.A. 507-08.

17

The IA report also discounted the statement of Sergeant Kirkland Marion on the supposed grounds that he had lied about not being present in the sally port when the incident allegedly occurred.  J.A. 697.  In fact, during his IA interview, he stated that he <u>was</u> in the sally port during the alleged incident, and, consistent with his contemporaneous DCDC 1, stated that Mr. McCormick did not strike Tobias.  J.A. 713-15, 826-27.  Sgt. Marion maintained his position, even after being threatened with disciplinary action.  J.A. at 697.

During his interview, Mr. McCormick also identified Lt. K. Buabang and Sgt. John Armstrong as having been in the sally port with him and each had also been identified by a second corrections officer as having been present.  J.A. 787, 827, 900.  Officer Buabang was neither interviewed by IA nor mentioned in its report.  J.A. 694.  Sgt. Armstrong was interviewed and grouped in the report with the officers who could not see the alleged incident.  J.A. 694, 893-95.  A third officer who the IA report identified as a possible witness, Cecil Dubois, was never interviewed after he asked to have a union representative present.  J.A. 694.

**Two Officers Changed Their Contemporaneous Accounts Only <u>After Being Placed Under Investigation</u>**

Two officers whose accounts were cited in the IA report did <u>not</u> report any physical contact between Mr. McCormick and Tobias when it had allegedly occurred.  Corporal Jimmy Harper, the officer who released over one-hundred inmates from their cells, filed an Official DCDC 1 the date of the alleged incident

18

and gave no indication that Mr. McCormick had slapped Tobias.  J.A. 716-18.  He changed his account of events only after being placed under investigation for releasing the prisoners.  Compare J.A. 696, 716-18 with J.A. 818-21.  Despite this turnaround, the IA investigators failed to ask him how clearly he had actually seen the alleged incident.  J.A. 818-19.  Corporal Harper admitted at deposition that he was "[n]ot really . . . watching what's going on" and was twenty to thirty feet away when it supposedly occurred.  J.A. 581, 585-87.  Ms. Patten did not bring any questions about Corporal Harper's credibility or inability to see the incident to the attention of Director Brown.  J.A. 506, 512, 516, 599.

Corporal David Thomas, a member of DOC's K-9 corps, was the second corrections officer cited in the IA report as having witnessed the alleged Tobias incident.  J.A. 692.  He, too, only claimed to have witnessed Mr. McCormick slap Tobias after being placed under investigation himself.  J.A. 642, 697, 947.  In fact, though recognizing that he was required to do so, Thomas did not file a DCDC 1 on the day of the inmates' release, and never even filed an incident report after supposedly seeing Mr. McCormick slap Tobias.  J.A. 642, 947.  He incredulously tried to explain this away by claiming that this was the only time that he has ever failed to fill out such a report. J.A. 642, 644.  He also admitted that he does not know how long he had a view of the sally port, that he was over ten feet away and in the process of turning when he supposedly saw Mr. McCormick slap Tobias,

19

and that he does not know where in the face Mr. McCormick supposedly slapped him.  J.A. 642.

Moreover, in his IA statement, Thomas stated that his duty hours on the date of the alleged incident were from 6:00 a.m. until 1:30 p.m.; he this confirmed on deposition, stating there was no reason why he would have worked different hours on January 13, 2006.  J.A. 648-49, 830.  Based on this account, the alleged incident between Mr. McCormick and Tobias had occurred after Mr. Thomas was off duty.  J.A. 10.  Again, Ms. Patten did not raise any of these issues with Director Brown.  J.A. 514.

## Lieutenant McCormick's Interview

The IA also interviewed Mr. McCormick regarding the alleged incident between him and Tobias.  J.A. 767-815.  Mr. McCormick denied all the charges against him.  J.A. 767-815.  This much was only natural, as he had not hit or done anything untoward to Tobias.  J.A. 418.

The IA violated Mr. McCormick's constitutional rights when it interviewed him:  after compelling him to give a statement, IA transmitted it to the U.S. Attorney's office for prosecution.  J.A. 110.  Corrections officers like Mr. McCormick are required to cooperate with DOC investigations and respond to their questions – but only once they are guaranteed immunity from prosecution.  J.A. 441.  IA guaranteed Mr. McCormick would be protected against self-

incrimination by providing him with a statement assuring as much and Mr. McCormick gave his statement based on that assurance. J.A. 890. Nonetheless, IA then forwarded the report to the U.S. Attorney's office for potential prosecution. J.A. 110. It did so despite the fact that the Supreme Court has <u>expressly</u> held that a public employee cannot be compelled to give a statement about his alleged misconduct at the workplace if it would place him at risk of self-incrimination. <u>Garrity v. New Jersey</u>, 385 U.S. 493, 497-98 (1967).

### <u>The Unreliable Medical Evidence</u>

Finally, the IA report concluded that the DOC infirmary's medical report confirmed that Mr. McCormick had hurt Tobias. J.A. 688. From the IA's reliance on this report, Director Brown was led to believe that "some injury had occurred." J.A. 505, 510. Tobias claimed that he went to the infirmary on the day of the alleged incident and the "doctor had seen streaks of blood . . . on [his] eardrum." J.A. 753. In reality, Tobias signed a written waiver refusing medical treatment that day, adding in his own handwriting, "I feel better." J.A. 723. It was not until the next day that he reported to the infirmary and claimed that he had been "punched." J.A. 923.

During litigation of this case, Mr. McCormick's medical expert examined the infirmary's records to ascertain whether they corroborated Tobias' account of an assault. J.A. 112-116. They did not. J.A. 112-116. Instead, the expert found

that they showed that Tobias had a history of "repeated (eleven) episodes of upper respiratory infections," and that in the same week of the alleged incident, he "was diagnosed . . . with an overt ear infection." J.A. at 113. While Tobias had originally reported injury to his right ear, the "consulting specialist" who had examined him "detected only findings on the opposite ear." J.A. at 114-116. Mr. McCormick's expert concluded that nothing in the infirmary report was "consistent with any trauma or damage to the originally reported right ear," and that Tobias instead had been diagnosed with an "ear infection." J.A. at 114-16. The "medical evidence" IA relied upon in an attempt to corroborate Tobias' account that Mr. McCormick had hit him simply did nothing of the sort.

## The Decision to Terminate McCormick

On February 13, 2006, shortly after Devon Brown began as DOC Director, Mr. McCormick wrote a letter to him repeating his protected disclosure that IA and now-Chief Patten had endangered the lives of two corrections officers by releasing their home addresses to violent criminals awaiting trial. J.A. 103-04.[5] It was only after Mr. McCormick made this disclosure that, for the first time, Ms. Patten notified Director Brown about the alleged incident between Mr. McCormick and

---

[5]     Mr. McCormick also disclosed that Ms. Patten attempted to have him terminated when she had "twisted an investigation" into the incident involving the seizure of narcotics from an inmate's cell.  J.A. 103-04.

Tobias.  J.A. 493-94.  Afterward, on March 9, 2006, Director Brown received the IA report and placed Mr. McCormick on administrative leave.  J.A. 492, 685.

Director Brown knew that if he decided to terminate Mr. McCormick, approval from the Deputy Mayor was required.  J.A. 496.  This is so because beginning on October 3, 2003, Mr. McCormick's appointment as a supervisory corrections officer had been converted to D.C.'s Management Supervisory Service, rendering him an at-will employee whose termination was not "subject to administrative appeal."  J.A. 1012-13; D.C. Code §§ 1-609.51, .54(a); D.C. Personnel Manual §§ 3818.1, .6 (J.A. 1007-08).  However, MSS employees are still afforded one career protection: they may only be terminated with the authorization of a Deputy Mayor for the District of Columbia.  D.C. Personnel Manual § 3818.1 (J.A. 1007); J.A. 496.  It was this very requirement that had protected Mr. McCormick once before from retaliation.  J.A. 105.

This same approval from Deputy Mayor Reiskin would have been required to terminate Mr. McCormick on the basis of the IA report.  J.A. 105, 496. Nonetheless, Director Brown went ahead and terminated Mr. McCormick for cause.  J.A. 990.  Despite specific discovery, there is no record of Deputy Mayor Reiskin having approved Mr. McCormick's termination in his personnel records or anywhere else in the agency's possession.  J.A. 419-20, 496, 986, 990, 664-1116. To the contrary, the SF-50 in Mr. McCormick's personnel records reflecting his

termination is an <u>unsigned</u> draft that states that Mr. McCormick was to be terminated based on a "disciplinary action signed by Devon Brown." J.A. 986.

### The Impact of Mr. McCormick's For-Cause Termination on His Career

Director Brown's termination letter stating that Mr. McCormick's termination was "based on an Internal Affairs investigative finding" meant that he was dismissed for "[w]rongdoing . . . of a serious nature" that could not possibly have been construed in a favorable light.   J.A. 990.[6]   Director Brown himself admitted that a termination of this nature would certainly damage a corrections officer's reputation and his chances for re-employment in that field.   J.A. 502. Barring extenuating "intervening circumstances" – such as a judicial order or executive pardon that would expunge the IA findings against Mr. McCormick – Mr. McCormick will never be employed by DOC again.   J.A. 500-01.   Although Director Brown could have reconsidered the evidence against Mr. McCormick, nothing that came up in this case convinced him to do so.   J.A. 501.

Mr. McCormick would have to disclose his termination for "serious wrongdoing" on his application for employment for any position with the District. J.A. 388-96.   He would also have to were he to apply for any position with the federal government.   J.A. 373-75.   If he were to apply for a corrections officer

---

[6]     Mr. McCormick's termination was indisputably for cause. J.A. 420, 528, 990; D.C. Code § 1-609.54(b) (severance pay is provided for MSS terminations without cause).

position with the Federal Bureau of Prisons, he would also be subject to a background investigation that would include scrutiny of his employment history. J.A. 371-72, 381-87. The same would be true if he applied for Virginia and Maryland agencies. J.A. 397-411. Any federal position of trust or one that requires a security clearance would also require a background investigation. J.A. 332-370, 397-411.

Mr. McCormick's bar to re-employment with DOC and the disclosure requirement have predictably had a negative impact on his career. He has applied for numerous law enforcement positions with the federal government. J.A. 420. After disclosing the circumstances of his termination, he did not receive a single interview. J.A. 420. Instead, he has had to resort to driving a truck as a contractor for Federal Express. J.A. 420.

### Lack of Due Process

Mr. McCormick was provided no due process in his termination action. He was not provided a copy of the IA report or any of the evidence or charges against him until discovery in this lawsuit; IA refused to release any of this information to him beforehand. J.A. 110-11, 414, 419. Director Brown admitted that Mr. McCormick did not receive a hearing before or after he was terminated and that he did not have any appeal rights. J.A. 504-05. He also admitted that he never saw the attachments to the IA report, never reviewed individual officers' statements,

and, consequently, had no reason to believe that any of them might have
exonerated Mr. McCormick.  J.A. 503.  Nonetheless, without taking any steps to
verify the information contained in the report, Director Brown terminated Mr.
McCormick for supposedly engaging in "wrongdoing . . . of a serious nature."  J.A.
502-03, 990.

## SUMMARY OF THE ARGUMENT

The district court's Memorandum Opinion was relatively faithful to the facts
established by Mr. McCormick, but was riddled with basic errors and
misapplications of well-established principles of law.  To start, Mr. McCormick
clearly raised a genuine issue of material fact that his termination – in addition to
numerous other prohibited personnel practices taken against him – was in direct
retaliation for the protected disclosures that he made regarding IA and Ms. Patten's
release of the names and addresses of two officers slated to testify in an upcoming
criminal case.  From there, Mr. McCormick essentially need only have shown that
such retaliation was a "contributing factor" to his termination or other prohibited
personnel practice taken against him.  D.C. Code § 615.54(b).  The burden was
then on defendant to show that it engaged in these practices for an "unrelated,
legitimate reason."  Id.

The district court, however, erroneously concluded that Mr. McCormick
could not prove that he was not terminated for a reason independent of defendant's

26

retaliation. J.A. 62. The district court erred as a matter of law in two separate ways in reaching this rather remarkable conclusion. First, it erroneously placed this burden on Mr. McCormick. J.A. 62-63. Second, it concluded that Mr. McCormick's termination occurred for a "legitimate reason" other than defendant's retaliation, i.e., the IA report, apparently just because it existed. J.A. 62-63. Mr. McCormick clearly demonstrated that the IA report was the sole basis of Director Brown's decision to have Mr. McCormick terminated and that it was prepared in direct retaliation for Mr. McCormick's protected disclosures about IA. J.A. 502-03. Therefore, Mr. McCormick not only created a genuine of fact about whether he was in fact terminated for a legitimate reason unrelated to the false and retaliatory IA report, he conclusively proved that his termination was the product of that report. J.A. 502-03. Without it, defendant would have had no reason at all to terminate him.

In addition, the district court erred in finding that defendant did not deny Mr. McCormick due process of law when it deprived him of his Fifth Amendment liberty interest in pursuing his chosen career path. J.A. 57-60. Supposedly this is so because Mr. McCormick, despite being an at-will employee without any administrative appeal rights, did not exhaust his administrative remedies. J.A. 58-60. While acknowledging that Mr. McCormick raised a genuine issue as to whether he was denied this liberty interest, it wrongly held that Mr. McCormick

27

had to exhaust administrative appeal rights through the D.C. CMPA.  J.A. 58-59.

The district court overlooked the fact that the CMPA was amended twenty years

after it was established in order to create the at-will Management Supervisory

Service, excluding employees under it from the act's coverage and appeal rights.

Compare D.C. Code § 1-602.01 and D.C. Code § 1-608.01(a)(13) with D.C. Code

§ 1-609.54.   By defendant's own admission and its internal publications, the

CMPA provides Mr. McCormick no recourse.  J.A. 492, 990, 1007; e.g., Clayton

v. District of Columbia, 2013 U.S. Dist. LEXIS 39270 at *34.

By the same token, Mr. McCormick was not provided any notice of the

charges against him or the opportunity to be heard either before or after his

termination.  Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972); Mathews v.

Eldridge, 424 U.S. 319, 349 (1976).  He did not even have access to the evidence

used against him until the discovery stage of this lawsuit, much less was he given

the chance to present his defense to the official responsible for deciding whether to

terminate him.  J.A. 110-11, 414, 419.

Finally, defendants Brown and Patten are not entitled to qualified immunity

for Mr. McCormick's civil damages.  The district court wrongly based its decision

to the contrary on its finding that Mr. McCormick's due process rights had not

been violated.  J.A. 60-61.  The availability of qualified immunity turns on one

question:  whether the "law was clearly established at the time an action occurred."

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The constitutional imperative protecting Mr. McCormick from being deprived of his Fifth Amendment liberty interest in pursuing his chosen career without due process of law had been clearly defined for the District for nearly ten years when he was terminated. O'Donnell v. Barry, 148 F.3d 1126, 1141 (D.C. Cir. 1998). Once it has been established that Mr. McCormick was, in fact, denied due process, it necessarily follows that defendants Brown and Patten can be held personally liable. Harlow, 457 U.S. at 818.

## STANDARD OF REVIEW

This Court's review of the lower court's decision to grant summary judgment is *de novo*. Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994). As the moving party, defendant could not be awarded summary judgment under Rule 56, Fed. R. Civ. P., unless it was "entitled to judgment as a matter of law" after drawing all reasonable inferences in favor of the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Reeves v. Sanderson Plumbing Prods, 530 U.S. 133, 150 (2000); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Adickes v. S.H. Kress Co., 398 U.S. 144 (1970). Mr. McCormick certainly raised genuine issues of material fact that were in his favor; defendant thus failed to satisfy the legal standard for an award of summary judgment below.

29

## ARGUMENT

**I.    The District Court Erred In Finding that Mr. McCormick Was Terminated For A "Legitimate" Reason Unrelated To His Protected Whistleblower Activity.**

The district court correctly "assume[d]," albeit without deciding, that Mr. McCormick presented sufficient evidence to establish a *prima facie* case as to his whistleblower claim under the D.C. Whistleblower Statute.[7]  J.A. 62.  From there, the court's reasoning was both cursory and misguided, concluding that his claim failed because he did not show that his termination "would not have occurred 'for an unrelated, legitimate reason.'"  J.A. 62.  Essentially, the district court held that because IA produced a false report implicating Mr. McCormick in the use of excessive force, defendant could not be held liable under the D.C. Whistleblower Statute.  J.A. 62-63.

The D.C. Whistleblower Statute is meant to ensure that "employees of the District government are free to report . . . threats to public health or safety" and "expose . . . incompetence, or administrative failure" "without fear of retaliation or reprisal."  D.C. Code § 1-615.53(a)(1), (5).  To that end, the statute states:

> A supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure . . . .

---

[7]    Whether Mr. McCormick established a *prima facie* case was irrelevant because defendant asserted a defense on the merits.  Compare <u>Brady v. Office of Sgt. at Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008) <u>with</u> J.A. 62.

D.C. Code § 1-615.53(a).   Under the statute, a "protected disclosure" is "any disclosure of information . . . by an employee . . . that the employee <u>reasonably believes</u> evidences" a "substantial and specific danger to the public health and safety."   D.C. Code § 1-615.52(a)(6)(E) (emphasis added).[8]   A "[p]rohibited personnel action includes but is not limited to:   "recommended, threatened or actual termination . . . or retaliating in any other manner against an employee because that employee makes a protected disclosure."  <u>Id.</u> § 615.52(a)(5)(A).

The statute places any remaining burden of proof squarely on defendants by providing that:

> [O]nce it has been demonstrated . . .  that an activity proscribed by § 1-615.53 was a contributing factor in the alleged prohibited personnel action against an employee, <u>the burden of proof shall be on the defendant</u> to prove . . . that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section.

<u>Id.</u> § 1-615.54(b) (emphasis added).   In other words, and contrary to the district court's application of the law, the burden was on <u>defendant</u> to prove that Mr.

---

[8]        Defendant claimed below that Mr. McCormick's Informative Report was not a protected disclosure supposedly because the U.S. Attorney's Office, rather than Ms. Patten, was responsible for the improper disclosure of the two corrections officers' personal information to violent inmates without redaction. Def. Mot. SJ at 37-37 [ECF #46]. However, Mr. McCormick plainly had a reasonable belief that Ms. Patten, who wrote and released the corrections officers' statements, was in fact the one responsible for their release.  Defendant's argument was not only highly unlikely to have been true, it was completely irrelevant because the Whistleblower Statute does not require a whistleblower to be right; it only requires that his belief in his disclosure is reasonable.   D.C. Code § 1-615.52(a)(6)(E).

McCormick would have been terminated even without the IA report, which it could not possibly do.

Mr. McCormick's whistleblower claim thus hinged on whether his protected disclosures were a "contributing factor" to the prohibited personnel actions taken against him.  D.C. Code § 1-615.54(b). A "contributing factor" is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision."  Id. § 1-615.52(a)(2).  Defendant could only have prevailed if it demonstrated that Mr. McCormick would have been disciplined "for legitimate, independent reasons" separate and apart from the IA report.  D.C. Code §1-615.54(b).

The district court clearly overlooked the fact that IA "report <u>itself</u>" was the sole "basis" upon which Director Brown relied "for terminating Mr. McCormick." J.A. 505.  The report a product of *animus* towards Mr. McCormick for making protected disclosures, and therefore, could not possibly be construed as an "independent" reason for terminating him.  See Staub v. Proctor Hospital, 131 S. Ct. 1186, 1192 (2011).

### a.  Mr. McCormick Faced Prohibited Personnel Practices After Making Protected Disclosures.

In case there is room for any doubt, Mr. McCormick clearly established a genuine issue of material fact that he made a protected disclosure that was a contributing factor to both his termination and other prohibited personnel actions.

The district court never held otherwise. J.A. 62. On March 25, 2005, Mr. McCormick disclosed through his official Informative Report that IA had endangered the health and safety of two corrections officers and their families by negligently releasing their names and home addresses to violent inmates in unredacted statements that Ms. Patten had taken. J.A. 963-68. This Informative Report clearly met the criteria for a protected disclosure, as it was transmitted to acting Warden Corbett and the Office of Internal Affairs. D.C. Code § 1-615.52(a)(6); Zirkle v. Dist. of Columbia, 830 A.2d 1250, 1260-61 (D.C. 2003). Mr. McCormick's disclosure was so serious that one of Director Brown's first acts as the Director of DOC was to prohibit the release of corrections officers' home addresses without his personal authorization. J.A. 505.

IA's first attempt at terminating Mr. McCormick in retaliation for his disclosure failed. It had previously launched an investigation and attempted to terminate him for allegedly filing a false report, but was unable to obtain the approval of the Deputy Mayor to have him terminated. J.A. 105. Not long after, the alleged Tobias incident presented Ms. Patten with another opportunity.

On February 13, 2006, Mr. McCormick wrote a letter to Director Brown repeating his protected disclosure about IA and now-Chief Patten. J.A. 103-04. It was only after this repeated disclosure that Ms. Patten had informed Director Brown about Mr. McCormick's supposed misconduct in the alleged Tobias

incident.    J.A. 493-94.    Once he learned of Mr. McCormick's protected disclosures, and even before receiving the IA report, Director Brown placed him on administrative leave.  J.A. 493-95, 988.  Then, despite admitting that he never reviewed any of the individual officers' statements or took any steps to verify the information contained in the report that Ms. Patten had prepared, Director Brown terminated Mr. McCormick and did so without the required approval of the Deputy Mayor.  J.A. 106-07, 492, 496, 502-03, 990; D.C. Personnel Manual § 3818.1 (J.A. 1007).    The statement Mr. McCormick was required to give to IA was then referred to the U.S. Attorney's Office for prosecution in violation of his right against self-incrimination.  J.A. 110-11, 441; <u>Garrity</u>, 385 U.S. at 497-98.

In short, as a result of his protected disclosures, Mr. McCormick was recommended for termination, twice placed under investigation, referred for prosecution in violation of the Fifth Amendment, and ultimately, terminated.  All of these are among the "prohibited personnel actions" that D.C. Code § 1-615.52(a)(5) specifically prohibits.

### b. Mr. McCormick's Protected Disclosures Were A "Contributing Factor" To His Termination.

Once Mr. McCormick made a *prima facie* case that he made a protected disclosure and was subjected to a prohibited personnel practice, he need only to have created a genuine issue of fact about whether his disclosure was in fact a "contributing factor" to IA's investigations and his ultimate termination.  D.C.

34

Code § 615.54(b). A "contributing factor" is "any factor which, alone or in connection with other factors, tend[s] to affect" an employer's actions towards the employee who made the protected disclosures "in any way." D.C. Code § 1-615.52(a)(2). There is a wide variety of evidence that can establish such a causal relationship. One particularly important way Mr. McCormick showed a causal relationship here was demonstrating that his termination was based on a "flawed" investigation. Mastro v. Potomac Electric Power Co., 447 F.3d 843, 855 (D.C. Cir. 2006). The IA report that Ms. Patten prepared failed to include exculpatory witness statements or to investigate the credibility of witnesses who had changed their contemporaneous account of the Tobias incident after it had occurred. J.A. 685-97. It also relied on faulty medical evidence that in no way corroborated Tobias' account of events. J.A. 112-116, 688. The vindictive manner in which the IA report was prepared itself is strongly indicative of retaliation for Mr. McCormick's protected whistleblower activity.

In addition, Mr. McCormick created a genuine issue of fact over whether defendant departed from procedure when he was terminated without approval of the Deputy Mayor, as required by its own internal regulations. J.A. 106-07; D.C. Personnel Manual § 3818.1 (J.A.1007). See Lathram, 336 F.3d at 1093. The IA also departed from procedure when it relied on Mr. McCormick's IA statement in referring him for prosecution despite its assurance that it could not be used against

35

him.  J.A. 110, 441.  In reviewing the IA report and deciding to terminate Mr. McCormick, Director Brown displayed a marked disinterest in the facts surrounding the alleged Tobias incident. J.A. 503.  In short, Defendant's disdain for Mr. McCormick's rights was palpable.

### c. Defendant Failed To Demonstrate That Mr. McCormick Was Terminated For An "Unrelated, Legitimate Reason."

The district court properly acknowledged that that IA's first attempt at having Mr. McCormick terminated constituted "retaliation."  J.A. 61.  It nonetheless concluded that Mr. McCormick's whistleblower claim could not survive summary judgment because he did not raise a genuine issue of fact about whether his termination would have occurred in the absence of defendant's supposed "unrelated, legitimate reason."  J.A. 61-63.  This conclusion, which was by no means easy to decipher, was based on the court's misguided supposition that because Director Brown based Mr. McCormick's termination on the IA report's finding that he used excessive force, that somehow made Mr. McCormick's termination independent of his protected activities.  J.A. 61-63.

In the words of this Court in an analogous setting, the district court's circular *ipse dixit* reasoning is flawed here.  Cf. Lathram, 336 F.3d at 1091.  The contents of the IA report were certainly not an unrelated reason to Mr. McCormick's whistleblower activity under the D.C. Whistleblower Statute.  Mr. McCormick established that the retaliatory IA report was a contributing factor to his

36

termination, which made it impossible for defendant to bear its burden of showing that he would have been fired for some other, <u>independent</u> reason.  D.C. Code § 1-615.54(b).

Even when there is no statute to this effect, the Supreme Court has definitively held:

> When a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted . . . by discrimination, discrimination might perhaps be called . . . a "causal factor" in the decision.

<u>Staub</u>, 131 S. Ct. at 1192.  In other words, even in the absence of the specific statutory provisions placing the burden on an employer to demonstrate that an adverse employment action was taken for an independent reason, defendant would still have been liable under the D.C. Whistleblower Statute for terminating Mr. McCormick on the basis of the false IA report.

## II.     The District Court Erred In Finding That Plaintiff's Fifth Amendment Due Process Liberty Interests Were Not Violated When He Was Terminated For Cause On False Grounds Of Misconduct.

Mr. McCormick's for-cause termination has "self-evidently" barred him from re-employment in the field of corrections.  <u>Fogg v. Gonzales</u>, 492 F.3d 447, 455 (D.C. Cir. 2007).  Whether he applies for corrections positions with the federal government or with states or local municipalities – or any other position of trust, for that matter – Mr. McCormick will be subject to a background investigation and a requirement to disclose that he was terminated for cause for assaulting a

37

restrained inmate.    J.A. 131-411. Since his termination, Mr. McCormick has

applied for and been rejected from numerous positions in federal law enforcement

and as a security guard and has had to resort to driving a delivery truck for Federal

Express.    J.A. 420.    Simply put, Mr. McCormick's for-cause termination has

precluded, and will continue to preclude, him "from pursuing" a career in his

"chosen" field of supervisory corrections.    O'Donnell v. Barry, 148 F.3d 1126,

1141 (D.C. 1998) (quoting Kartseva v. Dep't of State, 37 F.3d 1524, 1528 (D.C.

Cir. 1994)).

        The district court agreed, finding that Mr. McCormick raised a genuine issue

of fact that he had "a liberty interest in future employment that could not be taken

without an opportunity to be heard."    J.A. 58.    "The Constitution protects an

individual's 'right to follow a chosen trade or profession' without governmental

interference."  O'Donnell, 148 F.3d at 1141 (quoting Kartseva, 37 F.3d at 1259).

This recognized interest is a protected occupational liberty interest which Mr.

McCormick certainly has been denied as a result of his termination.  Id.

        While recognizing Mr. McCormick's protected liberty interest, the district

court nonetheless erred in finding that this deprivation did not occur without due

process of law.  J.A. 57.  The Supreme Court has long been clear that "[w]hen

protected interests are implicated, the right to some kind of prior hearing is

paramount."  Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972).    Absent

38

extraordinary circumstances, a person "must be afforded" this opportunity for a hearing "<u>before</u>" he is deprived of a protected interest.  <u>Id.</u> at 569-70 n.7 (emphasis added); <u>Mathews v. Eldridge</u>, 424 U.S. 319, 349 (1976).  This process must be meaningful and provide the deprived individual with "notice of the case against him and opportunity to meet it."  <u>Mathews</u>, 424 U.S. at 348 (quoting <u>Joint Anti-Fascist Committee v. McGrath</u>, 341 U.S. 123, 171-172 (1951) (Frankfurter, J., concurring).   In the employment context, this includes a "right to an evidentiary hearing" and "subsequent judicial review" <u>before</u> the deprivation "becomes final." <u>Mathews</u>, 424 U.S. at 349 (citing <u>Boddie v. Connecticut</u>, 401 U.S. 371, 378 (1971)).

Under some circumstances, a limited pre-termination hearing may be sufficient until a full due process hearing can be held.  <u>Mathews</u>, 424 U.S. at 349. The Supreme Court has held that when a post-termination hearing is to follow, the pre-termination hearing, "though necessary, need not be elaborate."  <u>Cleveland Bd. of Ed. v. Loudermill</u>, 470 U.S. 532, 545 (1985).  Under these circumstances, a full <u>post</u>-termination due process hearing allowing the same notice and opportunity to be heard is nonetheless required.  <u>Loudermill</u>, 470 U.S. at 545-546.

The district court reached its conclusion that Mr. McCormick was not denied due process based on a number of faulty assumptions.  First, it decided that Mr. McCormick did not have a Fifth Amendment claim against the District because he

supposedly had the opportunity for "adequate" post-termination process under the

D.C. Comprehensive Merit Personnel Act.[9]  J.A. 58.  It did so despite the fact that

by law, defendant's own publications, and the notice terminating him, Mr.

McCormick had no administrative appeal rights as an at-will employee in the

Management Supervisory Service under the CMPA.  J.A. 492, 990, 1007.    Its

conclusion overlooks the fact that the statute that created the MSS, amending the

CMPA 19 years after it was enacted, plainly excluded Mr. McCormick from any

---

[9]     The district court never addressed Mr. McCormick's liberty interest claim against the District of Columbia under 42 U.S.C. § 1983 separately, despite the fact that Mr. McCormick raised it in Count II of his Complaint.  J.A. 33-35.  It only acknowledged Mr. McCormick's § 1983 claims in the context of individual liability against defendants Patten and Brown, which is discussed in Part III of this Brief.  J.A. 53 n.2.  This may well be because defendant never raised Mr. McCormick's § 1983 claim against the District as a basis for dismissal on Summary Judgment, as Mr. McCormick noted in his Summary Judgment Opposition.

The law is clear that the District of Columbia, as a municipality, can be properly sued for damages under § 1983.  Owen v. Independence, 445 U.S. 622, 649-50 (1980); Singletary v. District of Columbia, 685 F. Supp. 2d 81, 88 (D.D.C. 2010); Ifill v. District of Columbia, 665 A.2d 185, 189 (D.C. 1995).  There is no exhaustion requirement for due process liberty interest claims raised under § 1983. One district court for the District of Columbia has held specifically that the CMPA is not an adequate forum for pursuing federal claims, and in particular, claims arising out of 42 U.S.C. § 1983.  Crockett v. D.C. Metro Police Dep't, 293 F. Supp. 2d 63, 67 (D.D.C. 2003).  This Court itself has even held that OEA proceedings, such as those provided by the CMPA, fail to "present[] an adequate forum" for the pursuit of § 1983 claims.  Bridges v. Kelly, 84 F.3d 470, 476-77 (D.C. Cir. 1996).  Even if Mr. McCormick was required to exhaust his administrative remedies under the CMPA in order to prevail on his Fifth Amendment liberty interest claim, he was not required to do so under his § 1983 liberty interest claim against the District of Columbia.

right to appeal.  Compare D.C. Code § 1-602.01 and D.C. Code § 1-608.01(a)(13) with D.C. Code § 1-609.54.

The district court, pointing to Doe v. U.S. Department of Justice, 753 F.2d 1092, 1102 (D.C. Cir. 1985) as the last word on the issue, also wrongfully assumed that Mr. McCormick's only remedy for his due process violation was a "name-clearing hearing."  J.A. 57-58.  However, Doe is completely irreconcilable with the Supreme Court's holding in Loudermill – which was decided later that year – that even in instances where a limited pre-termination hearing may be sufficient, a full post-termination hearing is still required.  Loudermill, 470 U.S. at 545-546.  What is more, Doe could not possibly be controlling here because it was a case against the federal government, which has sovereign immunity.  Library of Congress v. Shaw, 478 U.S. 310, 315 (1986).  As a municipality, the District of Columbia has no such immunity, which means that Mr. McCormick is entitled to full damages against it.[10]  Owen, 445 U.S. at 647, 649-50.

### a. The 1998 Amendment To The D.C. Comprehensive Merit Personnel Act That Created The At-Will Management Supervisory Service Did Not Provide Mr. McCormick Any Appeal Rights.

The district court was clear that at some point Mr. McCormick had to be provided with the evidence against him, notice of the charges, and the opportunity to present his case.  J.A. 58.  Without placing much emphasis on the pre-

---

[10]     One such remedy would be Mr. McCormick's reinstatement.

41

termination process,[11] the district court found that Mr. McCormick's Fifth Amendment due process rights were not violated because CMPA supposedly provided him with adequate post-termination process.  J.A. 59-61.  This finding was plainly wrong.  The CMPA does not provide <u>any</u> recourse for at-will employees like Mr. McCormick.  <u>E.g.</u>,  <u>Clayton v. District of Columbia</u>, 2013 U.S. Dist. LEXIS 39270 at *34.

The district court's finding was not that Mr. McCormick had a remedy under the CMPA, but merely that Mr. McCormick was covered by the statute.  J.A. 58.  That was only true when the statute was originally enacted.  In October of 2003, Mr. McCormick was converted to the Management Supervisory Service, at which point he became an at-will employee without appeal rights.  J.A. at 66, 67; D.C. Code §§ 1-609.51, .54; D.C. Personnel Manual §§ 3818.1, .6 (J.A. 1007-08).  In assuming that Mr. McCormick was nonetheless covered by the CMPA, the district court failed to recognize that the statute creating the MSS was promulgated nineteen years after the CMPA for the specific purpose of amending it to create this new class of at-will employees.  <u>Compare</u> D.C. Code § 1-602.01 <u>and</u> D.C. Code § 1-608.01(a)(13) <u>with</u> D.C. Code § 1-609.54.

---

[11]     The district court simply "doubt[ed]" that Mr. McCormick had any pre-termination due process claim because, it found, the CMPA provided Mr. McCormick the opportunity for sufficient post-termination process.  J.A. 58.

Although this issue has not yet been presented to this Court, district courts have distinguished between career employees and their protected <u>property</u> interests, which are covered by the CMPA, and "at-will" employees and the deprivation of their protected <u>liberty</u> interests, which are not afforded protection under the CMPA.[12]  <u>See</u>, <u>e.g.</u>, <u>Clayton</u>, 2013 U.S. Dist. LEXIS 39270 at \*34 ("Because Clayton was an <u>at-will, MSS employee</u> . . . she was not entitled to an OEA appeal before she was terminated.") (emphasis added); <u>Hoey v. District of Columbia</u>, 540 F. Supp. 2d 218, 226 (D.D.C. 2008) (noting that if the plaintiff was "not covered by the CMPA and [was] <u>instead an at-will employee</u>" he would have no actionable due process property interest) (emphasis added); <u>Alexis v. District of Columbia</u>, 44 F. Supp. 2d 331, 342-43, 349-350 (D.D.C. 1999) (permitting plaintiffs to proceed on their liberty interest claims while dismissing their property interest claims for failing to exhaust administrative remedies); <u>Holman v.</u>

---

[12]     Mr. McCormick's protected liberty interest in his right to follow his "chosen" career path is separate and distinct from a Fifth Amendment <u>property</u> interest in public employment.  <u>O'Donnell</u>, 148 F.3d at 1139, 1141.  A property interest only exists when someone has "a legitimate claim of entitlement" to that interest.  <u>Roth</u>, 408 U.S. at 577.  In the public employment context, no property interest exists unless a right to continued employment is conferred absent "cause." <u>Id.</u> at 578.  The distinction between property and liberty interests seems to have been lost on the district court.

<u>Williams</u>, 436 F. Supp. 2d 68, 76 n.4 (D.D.C. 2006) (noting that at-will employees have "no administrative recourse . . . for claims related to their termination").[13]

If these cases were to leave any room for doubt, Director Brown himself admitted that Mr. McCormick had no appeal rights. J.A. 492. The department's own internal regulations also reflected this fact, as did Mr. McCormick's termination letter. J.A. 990; D.C. Personnel Manual § 3818.1, .6 (J.A. 1007-08). Certainly, Mr. McCormick could not have been expected to exhaust his "administrative remedies" when the process the district court purports he should have pursued in fact would have not provided him any. <u>E.g.</u>, <u>Smith v. Robinson</u>, 468 U.S. 992, 1014, n. 17 (1984) (superseded by statute on other grounds); <u>Amato v. Bernard</u>, 618 F.2d 559, 568 (9th Cir. 1980); <u>cf.</u> <u>Valiant Steel v. Goldschmidt</u>, 499 F. Supp. 410, 411-12 (D.D. C. 1980).

### b. Defendant Failed To Provide Mr. McCormick The Record Underlying Its Supposed Grounds For Termination And Failed To Afford Him An Opportunity To Be Heard.

Not only did the CMPA fail to provide Mr. McCormick with adequate process for the deprivation of his occupational liberty interest, defendant also failed to provide Mr. McCormick any other opportunity to be heard or challenge the evidence used against him in defendant's decision to terminate him. Defendant

---

[13]     Unlike Mr. McCormick, the plaintiff in <u>Holman</u>, who was also an at-will employee, had appeal rights over matters that were unrelated to his termination. <u>Holman</u>, 436 F. Supp. 2d at 75.

suggested, and the district court accepted, that Mr. McCormick was provided an opportunity to "clear his name" when he was compelled to respond to questions placed to him during IA's investigation into the Tobias incident. J.A. 58. When this happened or, for that matter, how it could have happened, went unexplained. During the IA investigation, Mr. McCormick was not provided <u>any</u> notice of the evidence being used against him. J.A. 414, 419. In fact, he was not even able to obtain a copy of the IA report or the evidence upon which it was based until long after he was terminated and only through discovery in this suit. J.A. 110-11, 414, 419.

Without the IA report, Mr. McCormick had no opportunity to rebut any witness statements – including those of corrections officers who had changed their contemporaneous account of events after being placed under investigation, and whose credibility should and would have been placed under incredible scrutiny. J.A. 642, 685-97, 818-21, 947. Nor could he have known that he would need to highlight the credible eye-witness testimony of officers whose exonerating statements were buried in the IA report or present medical evidence on his own behalf to refute the infirmaries' faulty findings regarding Tobias' alleged injuries. J.A. 689-94, 880-84. In any event, the district court was missing the point. Even if he had the chance to rebut the evidence used against him during the investigation –

45

which he did not – he was <u>never</u> provided with such an opportunity in the context of defendant's decision to terminate him.  J.A. 504-05.

## III.   The District Court erred in finding that Defendants Brown and Patten were entitled to qualified immunity.

It is a well-settled principle that individual government actors can be held personally liable for violations of constitutional rights.  <u>Bivens v. Six Unknown Named Agents</u>, 402 U.S. 388, 395-97 (1971).  The district court incorrectly held that defendant's Brown and Patten were entitled to qualified immunity because Mr. McCormick "has not shown a violation of a constitutional right."  J.A. 60. However, for the reasons detailed in Part II above, he certainly did.  Mr. McCormick's constitutionally protected liberty interest – which the district court itself recognized – was violated without due process of law.  Since Mr. McCormick's liberty interest was clearly established before he was terminated, Director Brown and Ms. Patten were individually liable for the damages stemming from their unconstitutional conduct.

"[G]overnment officials performing discretionary functions" are only "shielded from liability for civil damages insofar as their conduct does not violate <u>clearly established</u> statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982) (emphasis added).  Thus, the availability of qualified immunity for defendants Brown and Patten simply turns on one question:  whether the "law was clearly established at

46

the time an action occurred." Id. at 818; accord Mosrie v. Barry, 714 F.2d 1151, 1158 (D.C. Cir. 1983).

There is no doubt that the law as to Mr. McCormick's due process liberty interests was clearly established at the time of his termination. The District knew for years before it terminated Mr. McCormick that it was unconstitutional to deprive an individual of the right to pursue his "chosen career" without due process of law. O'Donnell, 148 F.3d at 1140-41. Loudermill's due process requirements of a pre- and post-termination hearing has been a staple of constitutional law for twenty-eight years. 470 U.S. at 545-46. Mathews has been well-settled for more than thirty years. 470 U.S. at 348-489. Defendants' failure to provide Mr. McCormick notice or a pre- or post-termination hearing, based on the report that Ms. Patten prepared, violated these rights.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff respectfully requests that the Court reverse the district court's grant of summary judgment to defendant and remand this case to the district court for a trial on the merits.

Respectfully Submitted,

Robert C. Seldon, Esq.
Lauren E. Marsh, Esq.
Robert C. Seldon & Assoc., P.C.
1319 F Street, NW, Suite 200
Washington, D.C. 20004
(202) 393-8200
Counsel for Appellant

By:   /s/ Lauren E. Marsh
Lauren E. Marsh, Esq.

48

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,257 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Respectfully submitted,

Robert C. Seldon, Esq.
Lauren E. Marsh, Esq.
Robert C. Seldon & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C.  20004
Ph (202) 393-8200
Fax (202) 318-2287
Counsel for Appellant

By: <u>  /s/ Lauren E. Marsh</u>
Lauren E. Marsh, Esq.

# **<u>Addendum of Statutes, Rules, and Regulations</u>**

## 42 U.S.C. § 1983

**Civil action for deprivation of rights.**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**D.C. Whistleblower Statute**

**D.C. Code § 1-615.51.  Findings and declaration of purpose**

The Council finds and declares that the public interest is served when employees of the District government are free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal. Accordingly, the Council declares as its policy to:

(1) Enhance the rights of District employees to challenge the actions or failures of their agencies and to express their views without fear of retaliation through appropriate channels within the agency, complete and frank responses to Council inquiries, free access to law enforcement officials, oversight agencies of both the executive and legislative branches of government, and appropriate communication with the public;
. . .

(5) Ensure that rights of employees to expose corruption, dishonesty, incompetence, or administrative failure are protected.

**D.C. Code § 1-615.52(a)(2), (5), (6).  Definitions.**

(a) For purposes of this subchapter, the term:

. . .

(2) "Contributing factor" means any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.

. . .

(5)

(A) "Prohibited personnel action" includes but is not limited to: recommended, threatened, or actual termination, demotion, suspension, or reprimand; involuntary transfer, reassignment, or detail; referral for psychiatric or psychological counseling; failure to promote or hire or take other favorable personnel action; or retaliating in any other manner against an employee because that employee makes a protected disclosure or refuses to comply with an illegal order, as those terms are defined in this section.

(B) For purposes of this paragraph, the term:

(i) "Investigation" includes an examination of fitness for duty and excludes any ministerial or nondiscretionary factfinding activity necessary to perform the agency's mission.

(ii) "Retaliating" includes conducting or causing to be conducted an investigation of an employee or applicant for employment because of a protected disclosure made by the employee or applicant who is a whistleblower.

. . .

(6) "Protected disclosure" means any disclosure of information, not specifically prohibited by statute, without restriction to time, place, form, motive, context, forum, or prior disclosure made to any person by an employee or applicant, including a disclosure made in the ordinary course of an employee's duties, by an employee to a supervisor or a public body that the employee reasonably believes evidences:

(A) Gross mismanagement;

(B) Gross misuse or waste of public resources or funds;

(C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;

(D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or

(E) A substantial and specific danger to the public health and safety.

## D.C. Code § 1-615.53.  Prohibitions.

(a) A supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order

(b) Except in cases where the communication would be unlawful, a person shall not interfere with or deny the right of employees, individually or collectively, to furnish information to the Council, a Council committee, or a Councilmember.

D.C. Code § 1-615.54(b).  Enforcement.

In a civil action or administrative proceeding, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by § 1-615.53 was a contributing factor in the alleged prohibited personnel action against an employee, the burden of proof shall be on the defendant to prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section.

## D.C. Comprehensive Merit Personnel Act

### D.C. Code § 1-602.01(a).  Coverage; exceptions.

(a)  Except as provided in subsection (c) of this section, unless specifically exempted from certain provisions, this chapter shall apply to all employees of the District of Columbia government, except the Chief Judges and Associate Judges of the Superior Court of the District of Columbia and the District of Columbia Court of Appeals and the nonjudicial personnel of said Courts. With the exception of subchapters V and XVII of this chapter, and§ 1-608.01(e), employees of the D.C. General Hospital and the D.C. General Hospital Commission shall be exempt from the provisions of this chapter.

### D.C. Code § 1-606.03.  Appeal Procedures.

**(a)**  An employee may appeal a final agency decision affecting a performance rating which results in removal of the employee (pursuant to subchapter XIII-A of this chapter), an adverse action for cause that results in removal, reduction in force (pursuant to subchapter XXIV of this chapter), reduction in grade, placement on enforced leave, or suspension for 10 days or more (pursuant to subchapter XVI-A of this chapter) to the Office upon the record and pursuant to other rules and regulations which the Office may issue. Any appeal shall be filed within 30 days of the effective date of the appealed agency action.

### D.C. Code § 1-608.01(a)(13).  Creation of Career Service.

**(a)**  The Mayor shall issue rules and regulations governing employment, advancement, and retention in the Career Service which shall include all persons appointed to positions in the District government, except persons appointed to positions in the Excepted, Executive, Educational, Management Supervisory, or Legal Service. The Career Service shall also include, after January 1, 1980, all persons who are transferred into the Career Service pursuant to the provisions of subsection (c) of § 1-602.04. The rules and regulations governing Career Service employees shall be indexed and cross referenced to the incumbent classification system and shall provide for the following:

**(13)**  Separations for cause, which shall be subject to the adverse action and appeal procedures provided for in subchapter XVI-A of this chapter.

## Management Supervisory Service

### D.C. Code § 1-609.51.  Establishment.

There is established within the District government the Management Supervisory Service to ensure that each agency has the highest quality managers and supervisors who are responsive to the needs of the government. Persons appointed to the Management Supervisory Service are not in the Career, Educational, Excepted, Executive, or Legal Service.

### D.C. Code § 1-609.54.  Employment-at-will.

**(a)** An appointment to a position in the Management Supervisory Service shall be an at-will appointment. Management Supervisory Service employees shall be given a 15-day notice prior to termination. Upon termination, a person with Career or Educational Service status, or with Excepted Service status due to appointment as an attorney pursuant to § 1-609.09, may retreat, at the discretion of the personnel authority, within 3 months of the effective date of the termination, to a vacant position within the agency to which he or she was promoted for which he or she is qualified.

## D.C. Personnel Manual

**§ 3818.  Employee Rights.**

§ 3818.1.  No termination action shall be initiated under this chapter unless first authorized by the agency head (or his or her designee) and the Deputy Mayor for the agency.

§ 3818.6.  Terminations from the Management Supervisory Servicve shall not be subject to administrative appeal.

# **CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of April, 2013, one copy of the foregoing Brief for Appellant was served by First Class Mail, and one copy was served electronically through the Court's ECF system, upon:

Holly M. Johnson
Assistant Attorney General
Office of the Attorney General
  for the District of Columbia
441 4th Street, N.W., Sixth Floor South
Washington, D.C. 20001


/s/ Lauren E. Marsh
Lauren E. Marsh